Each side has 15 minutes, so it behooves you to get to your strongest argument first. We've read the briefs, we're familiar with the records, fairly straightforward, but somebody's life is at stake in terms of, it's quite a sentence. So, anytime you're ready, Ms. Park. Ms. Park. May it please the court. My name is Jean Park and I represent Russell Mims. Mr. Mims was convicted of attempt first degree murder. However, the evidence shows that he was acting in self-defense. The evidence shows that Mr. Mims, who was 50 years old at the time, had just witnessed the brutal beating of William Fisher. William Fisher was beaten by a group of young men in their early 20s and he was repeatedly hit, kicked, and punched for about 15 to 20 minutes to the point where he was left unconscious. And what's important to note is that this beating was in fact planned by a state's witness, Carmen Jackson. She had just gotten into a heated fight with Fisher, who was her husband, and what she had done is gathered family members, including another state's witness, Charles Coleman, and basically they went and in Carmen's words, they did what they had to do. They jumped him and did what they had to do. And basically, when Mr. Mims, who was riding his bike and who happened to see this fight against Fisher, when he saw this, after he saw this, he said, stop, you're killing him. And basically, as soon as he said that, this group of young men, who was in their early 20s, whereas Mr. Mims was 50 years old, this group of young men immediately came and started hitting him. There's testimony that he was hit about 10 times. He was clearly outnumbered and he did what he could to try to get away. He pulled out a pocket knife as he was backing up and as he swung it, he ended up stabbing Tony Coleman once. As soon as that happened, Mr. Mims got back on his bike and left. You said it was self-defense. The trial court said it wasn't. Why should we say the trial court was wrong? You also said that he said, stop, you're killing him. And the trial court obviously didn't agree with that. So tell me why we should disagree with the trial court. Well, while the trial court should be given deference, their findings aren't conclusive. And basically here, we believe that the evidence was just so, based on the state's witnesses testimony, the evidence was just so unreasonable, improbable, unsatisfactory as to raise a reasonable doubt of the defendant's guilt. And if you look at what the state's witnesses say, they claim that Mr. Mims was not acting in self-defense, whereas the defense witnesses say they were. And the state's witnesses, basically, they were, if you just look at it, they were unbelievable. Their version of events is that once the beating of Fisher happened, basically for what seems like no reason at all, Mr. Mims just turned and stabbed Tony. That doesn't make sense. And more than that, as I pointed out earlier, Carmen and Charles were the ones who would be implicated in the beating of Fisher. They are the ones who gathered various family members. They went and they were the ones who plotted and planned this beating of Fisher. Didn't Charles come along after Charles? Charles wasn't one of the initial three or four people, two people who jumped on Fisher. That's correct, Your Honor. However, she did call Charles and let him know as to what was happening. Basically, though, regardless, as I point out in the opening brief, all of the state's witnesses were related to one another. They're all family members. They had a motive to protect themselves. They had a motive to lie. And as I also point out in the opening brief, in the first argument, they were just overall inconsistent. They contradicted themselves numerous times. They contradicted each other. They were just unbelievable. And in a case like this where so much rests on the facts and so much rests on the credibility, it is important that we look at the state's witnesses' credibility because it's their burden to prove or to disprove whether or not Mr. Mims was acting in self-defense. So we have conflicting testimony, right? Yes, there is conflicting testimony. And then there were policemen who came to the scene who took reports at the scene. Yes. And their reports at the scene, I believe, indicated that Carmen and Charles said one thing of which you're alleging later on they didn't change their position. Yes. Okay. Well, they just contradicted themselves. With Carmen, it was in their handwritten testimony as well as in her interview. And then again, she said something different at trial. And this is an issue for the trier of fact to decide, right? Yes. Who happens to be not a jury in this case but the judge. The judge trial. Yes. Okay. So then what should be the standard for us to reverse the judge? The standard to reverse the judge? Right. If the judge says he heard the testimony and he believed, I'm assuming he believed what Carl and Charles said on the police report, and then you're asking us to reverse what the judge said. Why should we reverse it? Or what is your position on why we should reverse the judge? Well, as I said earlier, I believe that here you should reverse because we believe that the evidence overall when you look at it is just so unreasonable as to give reasonable doubt of Mr. Mims' guilt. And the trial judge himself actually said that self-defense exists. He said that, and to quote him, he said the extent of it is an issue but not the fact that it existed. So the trial judge himself acknowledged that self-defense did exist. However, based on the trial judge's statements, it seems as though he did misunderstand how the law of self-defense worked in that he asked defense counsel various questions such as, you know, are you obligated to stab someone in a less deadly area such as the arm or leg? And based on his comments, it seems that he misunderstood the law of self-defense because Illinois case law is clear that you are not required to flee if you feel that you're threatened with deadly force. You're not required to wait until you're hurt. You're not required to stab in a less deadly area, you know, such as the arm or the leg. But you basically, you can use deadly force to protect yourself if you reasonably believe that it was necessary to prevent your own imminent death or great bodily harm. And you're not required to make a precise decision or flawless judgment in terms of where you ended up stabbing the individual to protect yourself. And I believe that this court should reverse because while the trial court is given deference, I believe that is tempered when the trial judge misunderstood the law of self-defense as well. Well, he's been around a really long time, you know, Mr. Claps, Judge Claps. First, I want to thank you for the great brief. I love the columns. That actually helps because normally when they say, didn't she say this, which was more than that, it's really hard to follow when it's not in columns. I mean, there are answers, obviously, which would be that everything is a summary except the trial testimony. But it's very helpful, including where you have it, Carmen's testimony against Charles' testimony. But it's very difficult. You can see where we're going. It's really, really hard to say on a bench trial the trial court in an old hand was mistaken in self-defense. Judges believe in self-defense, especially in Cook County, they believe in self-defense. And jurors generally do not. So it's tough. Anything else? Yes. I would just like to say that even if this court, this reviewing court, also finds that Mr. Mims did not act in self-defense, even if they do believe the state's witness's testimony, another argument that I made in my brief is that regardless of that, in order to prove the defendant guilty of attempt for screen murder, the specific intent to kill has to be found. But he stabbed him in the heart, right? He did. Okay. Now, everybody, most of the witnesses seem to say he stabbed him twice, but the doctor said it was only once. Yes. Is that correct? Yes. That's why I believe it's undisputed because the doctor, as well as the paramedics, said it was one time. And it's a high burden in terms of finding specific intent to kill. And even if, when you separate out all the facts and you look at just the undisputed facts, just the undisputed facts show that Mr. Mims stabbed Tony one time. He did not make any verbal threats to kill. He immediately left. And when he left, there's testimony from the state's witnesses that Tony was still standing. He was talking, and he fell after Mr. Mims left.  And just in closing, as I said earlier, there's Mr. Mims, we believe, was acting in self-defense. And the state failed to prove beyond a reasonable doubt that he wasn't. And even if this court found that he wasn't, there wasn't the specific intent to kill, which, therefore, we're asking that Mr. Mims' conviction be reversed. Just in three sentences. I don't know if Judge Glantz at all could be any judge. But he was there, and he decided the case. Three sentences. Why should we disagree with him and reverse him? Well, three sentences. Okay. Close. Don't worry about it. When you start repeating yourself, I'll stop. Okay. Well, I believe that he should be reversed because he himself acknowledged that self-defense exists. And then he went on, and he seems to have misunderstood how the law of self-defense works. And based on that, this reviewing court should reverse where there is a misunderstanding of law on the trial judge's part. And the facts are clear here, and the defense witnesses were credible, whereas the state's witnesses weren't. Thank you. Thank you. State. Your Honor, Assistant State's Attorney Jason Quayle on behalf of the people of the state of Illinois. May it please the Court, the standard review here is in the light most favorable to the prosecution whether any rational trial effect could have found that the state met its burden on the elements beyond reasonable doubt. Also, to address defense counsel's issue that she now raises for the first time that was not raised in her appeals brief that the judge misapplied the law. There was never anything that was stated in the briefs that the judge did misapply the law. The only thing that she stated as far as the self-defense claim goes was that the state did not meet its burden beyond reasonable doubt in disproving one of the six elements that we needed to disprove. Therefore, we would ask that you do not consider that argument as it was not raised below. Well, she did point out in her opening brief that the judge said, oh, there is some self-defense. I'm just debating the extent of it. And I'm pretty sure she did say something about the judge misapplied it, I think, as to burdens, and the question being what happens when the evidence goes in whose turn. Whose burden is it to show the lack of self-defense?  Or is it the state's burden to show that there was no self-defense? Go ahead, though. Okay. Well, besides that, Your Honor, as well, we also proved beyond reasonable doubt that the defendant did not act in self-defense. If you take the testimony of the state witnesses in the light most favorable to the people, you will find that we did prove that the defendant did not act in self-defense. Carmelo Jackson and Charles Coleman both testified that when Russell Mims, the defendant, interceded, the fight was already over. And at that point, they testified that he ran up to the victim, Tony, and stabbed him, plunged a knife into his heart. Now, there was no testimony that Tony had any sort of weapon at that point. Tramiel Ware also testified for the state. Although he said in his trial testimony that he thought that he acted in self-defense, as far as the defendant goes, and that the defendant was threatened by numerous individuals and they were fighting him, in his handwritten statement that he gave to ASA Ambrose, Detective Volos was also present there, he stated that at no point in time did he see Tony approach the defendant, at no point in time did he see the defendant move away from Tony, and at no point in time did he see Tony swing at the defendant. All he stated was that he saw the defendant get off his bike, run towards Tony, and stab him directly in the chest. Now, if you want to take, even though matters of credibility are to be determined, as Your Honor said, by the trial court and not this court, and it's not the function of this court to try the defendant on issues of credibility, even if you take the testimony of the defense witnesses in regards to self-defense as true, there is still not enough there to raise a cognizable issue of self-defense. In this case, Tramiel Ware testified that he did not really see what was going on initially, he did not see if Tony was involved, did not really see what was happening. All of a sudden, he changed his testimony to say that, oh, well, I saw him get hit in the face ten times after he tried to help the victim, Fisher, off the ground. The testimony of Marcus Pryor is the only person who said anything about how people were trying to fight the defendant after the fight between Fisher and the others had already ended. William Fisher did not see anything. He was already unconscious at the time that the next fight ensued. He testified that he got up, he was dazed, there was no one around at that time, and then he proceeded to walk home. He was not brutally beaten enough, he did not seek hospital treatment, he said himself, as to his wounds. Although counsel says that he was brutally beaten, he was able to walk home, did not seek medical treatment at all. And therefore, even if you take the testimony of the defense witness as true, there is no evidence that the defendant was in fear of his life or in fear of a grievous bodily injury at the time that he stabbed Tony. Your Honor, as you can see from the record, the defendant did not testify. To prove that there was actual and subjective belief on his part that he was in such danger is almost near impossible when he did not testify to his subjective belief. So in this case, you have the testimony of the witnesses as far as that goes. Now, as I cited in People v. Belkedo, using excessive force, and also according to the Illinois pattern jury instructions, when force is so excessive that it is disproportionate, then that belies a claim of self-defense. The pattern jury instructions say, however, a person is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or to another. In this case, there was no danger of great bodily harm to Mr. Mims. No one testified, although Marcus Pryor may have testified that someone used brass knuckles in the first fight against William Fisher, no one testified that anyone came at Mr. Mims with a weapon. He was not cornered into any sort of area where he could not move away. He had a bike at the scene. He was in an open alley. He could have done something that was not stabbing someone directly in the chest. And in the case that the appellate counsel cites in the interest of SM, in that case, it's completely not analogous to the case of Barr, because in that case, there was four-on-one, the defendant tried to flee, he then fired a warning shot in the air, and he was also cornered. None of that is present in our case. Only then did the court then find that because he then shot two of the people fatally of the four, was he justified in using self-defense. In this case, as the trier fact also drew attention to, there was nothing as far as why he should have stabbed someone in the chest. The trier fact himself said, could he have stabbed him in the arm? Could he have threatened to stab him? Things along those lines. And although the trier fact acknowledged that there was an issue of self-defense, one, the trier fact ruled guilty and showed that that did not rise to a legal claim of self-defense, and two, the mere fact that the trial judge acknowledged that there was an issue does not mean that the issue was so persuasive as to show that there was self-defense itself. Well, let's assume for a minute that the defense attorney is saying that Carmen and Charles and Cardell and Bill, that they're all related or family members or close friends. And Mims is on his bicycle, and he sees this guy being beat badly. And let's assume that Mims did say, hey, you guys stop this. And then they turned on Mims and jumped on him. And then all the family members are saying it didn't happen that way. But the trier, who I guess is an old member of this family, he says, I saw them jump on Mims. And then Mims then protected himself after Mims watched them beat somebody half to death. Do you think then he would have a right if he had a knife to pull that? I would respectfully disagree that he would have a right to use that. As far as that goes, it's still using disproportionate force. There was no evidence that weapons were used. There was no evidence as to how far he was beaten, how savagely the defendant was beaten. All of it said that he was struck in the face by Jamel Ware, who did not even say who struck him in the face, did not even say that Tony Coleman, the victim, struck him in the face. Also, Jamel Ware, who I understand, Your Honor, is saying that there may be certain issues of bias as far as family members go, as Charles Coleman and Carmela. But Jamel Ware was not related to the situation at all. And right after the incident occurred, he spoke with ASA Ambrose, and he never once said that the defendant was acting in self-defense. He said that he watched him get off the bike, run up to Tony, and stabbed him in the chest. And he is not an interested party at all in the situation. So the only witness that the defendant has that supports his claim of self-defense is Marcus Pryor. And other than that, that is it. So I would say that still, even regarding Marcus Pryor's testimony, the use of a knife and plunging it into the victim's chest and leaving him, as the Court has probably taken notice, in a persistent vegetative state for approximately three years now is disproportionate. And that also leads into my argument about the specific intent to kill. The Ware brothers and Pryor came to the scene at the same time. They were together, right? Yes. And they viewed different. Yes. They saw the same incident and viewed it differently. And viewed it differently. As far as counsel's argument to specific intent to kill, specific intent often has to be inferred by the circumstances, as the intent of the individual cannot be determined, especially if they don't testify. So in this case, as I cited in my brief, what needs to be looked at is the character of the attack, the use of a deadly weapon, and the nature and extent of the injuries. In this case, as I just stated, the nature and extent of these injuries are undisputed. The victim was basically, as Kimberly Josephs, the attending surgeon who received him at the hospital, at Georgia Hospital, said, for all intents and purposes, he was dead on arrival. They massaged his heart, administered certain drugs, and were able to restart his heart. He is still, at this point I can't speak for what his state is, but at the time of trial he was in a persistent vegetative state. He was intubated with a feeding tube. That was the damage that this defendant did by stabbing him in the heart. He used a deadly weapon, as your honors will take notice of, in stabbing him. The character of the attack, as I stated before, was disproportionate. And in stabbing him in the chest, he evinced his attempt to kill him. He did not stab him in any other place of the body. He stabbed him directly in the heart, penetrating his right ventricle, as Dr. Kimberly Joseph testified. This was not just a wild, wielding attempt to stop a fight. This was a direct attempt to stab someone and kill them. And that's exactly what the evidence shows. So as to specific intent, I will argue that the defendant did have specific intent to kill, and it's shown by where he stabbed the victim. At page 11 of your brief, you recite Mr. Mim's incredible criminal history of eight separate felony convictions since 1974. So in the last, up to this time, 30 years, when he committed this last one, six of which were violent, rape, voluntary manslaughter, aggravated battery, rape, bodily harm, two armed robberies. As far as you know, is your recitation at page 11 accurate? It is accurate, your honor. Okay. And the state chose not to charge this man as a habitual criminal at seeing natural light? Judge, as far as that issue goes, I would defer to my supervisor on that issue, Matthew Connors, in order to answer whether there was an error as far as the habitual criminal provision goes. And I think they did file it, and the judge denied it. Oh, really? So if you want, Mr. Connors. I'd like to hear it. Okay. If you have any more questions for me at this point, Connors, with that, I would argue that the trial court should not reverse the ruling of the lower court. Excuse me. The total court should not reverse the ruling of the trial court, because the defendant did not act in self-defense, and he had specific intent, as shown by the record. Thank you, your honor. Do you think that you're conceding a minimus issue? As far as a minimus issue, I would have my supervisor talk to you about that as well. Thank you, your honor. Okay. May it please the Court, Matthew Connors, on behalf of the people of the State of Illinois. As Justice Quinn was correct to note, there is some question as to whether or not the defendant would have been properly convicted and sentenced as a habitual criminal offender. There are numerous descriptions in the transcript located at pages T12 and going forward, where the people filed a notice of intent to proceed as a habitual criminal. The defense counsel, upon receipt of that, filed a response motion, a notion to dismiss the people's notice, and a series of post-trial motions basically followed upon this. The circuit court ruled that, as a matter of due process and fundamental fairness, the people were obligated, before trial, to tender some sort of information demonstrating the defendant had two prior Class X convictions. Now, circuit court ruled that this, although not required by Section 533B, that that would be somehow required by due process in addition to the statutory language. Circuit court then reconsidered the matter on the next court date and said, this issue is not right. I have not yet to rule on the defendant's motion for a new trial. Circuit court said, I am withdrawing my previous ruling. I will now address defendant's motion for a new trial. Deny defendant's motion for a new trial, and then ask the State if they wish to proceed to sentencing again. The State again filed a notice of intent to proceed pursuant to the habitual criminal act, and the circuit court said, leave to file denied. The parties then proceeded to sentencing. However, as Justice Quinn was correct to note, the record before this court unequivocally establishes the defendant has two prior Class X convictions, 82-17968, a conviction for armed robbery in which he received. How did you not forfeit it by, obviously it was a battle down before the old hand, and it's not, it's mentioned at page 11, just because I don't know how to read a rap sheet. It's not before he chose not to raise it on appeal. Your Honor, to the extent that the issue was not raised by the State initially, it's not clear under 604A that people would have a basis under which to appeal that sentencing order. Second of all, the instant sentence is actually void, and therefore can be attacked at any time. I would direct this Court's attention to people. Usually it would require a brief. You can raise it in a brief. Normally not at orals when the judge says, by the way, I haven't done this in a long time. It seems to me that it's a required natural right. Go ahead. The people would be more than willing to brief the issue, to switch the Court's doubts if necessary, or referring to the decision of People v. Arna, the Court in that case, to respond to raise the issue of whether. We're intimately familiar with Arna. Well, having said that, Your Honor, again, the issue may be properly raised either at the oral argument or by the Court itself, and if the record does demonstrate that error occurred below and that an instant sentence was void, it can be addressed for the first time by this Court. If you know, is the 22-year sentence 85 percent, or is it 50 percent? Your Honor, I do not know the answer to that. I believe it would be 85 percent. We know it's certain. Okay. Again, the people. Was it a minimus issue? To the extent that the minimus was an error, the people do concede that it should have been listed as a Class X issue. Yeah, as opposed to a Class M. Correct. Okay. Thank you. Thank you very much, Your Honors. For all those reasons, those stand the case in the Supreme Court. Yes, you affirm the judgment of the Supreme Court. Thank you. Ms. Park, reply. Your Honor, just to clarify, he was given 22 years, and it was at 85 percent. Okay. And when Mr. Mims is released, he will be almost 70 years old. From his background, I can assure you if he lives that long, he will immediately commit a new crime. He's never failed. He's never completed a parole in his life. Eight times he's violated parole. He's never achieved getting out of parole. But there's always hope. Yes, exactly. And his prior criminal record is separate and apart from the issues in this case. And in regards to an habitual criminal issue, it would be just fundamentally unfair for the State to bring that to this point. In response to what the State pointed out, it's important to note that the defense witnesses here were credible. They were consistent. They were not impeached. Their story, their version of events is believable. They didn't have a motive to lie. They're just neighborhood teenagers who just witnessed what had happened. There were no family relationships here. Additionally, on the other hand, as I stated earlier, the State's witnesses were unbelievable. They were related family members. They had a motive to protect themselves, and they were just overall inconsistent. And the bottom line is that the evidence shows that Mr. Mims was clearly outnumbered. He had just witnessed this brutal beating, and now this group of younger men were attacking him. And based on that, Mr. Mims used a degree of force that he reasonably believed was necessary to protect himself. And during the State's argument, the State misunderstood the law as well of self-defense. The law of self-defense is clear that you don't need to use less deadly force. You're not required to stab someone in the arm or the leg when your mission is to get away. Your mission is to protect yourself. The law is clear that you're not required to reason out your exact response or to know the exact amount of force to use. You're not required to flee either. Based on the circumstances, Mr. Mims used a degree of force that he believed was reasonably necessary and we believe was objectively reasonable, so he acted in self-defense. And when you look at the defense testimony and the State's testimony, the defense witnesses were more credible, and the State just failed to prove their burden beyond a reasonable doubt. Thank you. Are there any more questions? Not at this point. This case will be taken under advisement, and this Court will be adjourned.